# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| EVA ALICIA BERRÍOS PAGÁN, JUSTY ROMÁN COLÓN AND THEIR CONJUGAL PARTNERSHIP; YAZMÍN BERRÍOS FUENTES; KRISTIAN CASTILLO BERRÍOS; THE ESTATE OF LUIS MANUEL CASTILLO BERRÍOS<br><br>        Plaintiffs,<br><br>v.<br><br>MENNONITE GENERAL HOSPITAL, INC. (D/B/A HOSPITAL GENERAL MENONITA, INC. AND/OR SISTEMA DE SALUD MENONITA); DR. RENE CASAS BENABE, JANE DOE AND THEIR CONJUGAL PARTNERSHIP, DR. RUBEN RUBERO APONTE, JANE ROE AND THEIR CONJUGAL PARTNERSHIP, DR. KEILA S. RESTO TORRES, JOHN DOE AND THEIR CONJUGAL PARTNERSHIP; EMERGENCY SERVICES GROUP, INC.; PROFESSIONAL PARTNERSHIPS A, B AND C; CORPORATIONS D, E AND F; DR. RICHARD ROE; INSURANCE COMPANIES X, Y AND Z<br><br>        Defendants | **Civil No.:**<br><br>Medical Malpractice & Damages<br><br>Plaintiffs Demand Trial By Jury |

## COMPLAINT

**TO THE HONORABLE COURT:**

COME NOW, Plaintiffs, Eva Alicia Berríos Pagán, Justy Román Colón and their Conjugal Partnership, Yazmín Berríos Fuentes, Kristian Berríos Fuentes and the Estate of Luis Manuel Castillo Berríos (hereinafter collectively referred to as the "Plaintiffs"), through the undersigned counsel, and very respectfully STATE, ALLEGE and PRAY as follows:

1

## I.  INTRODUCTION

1. This is a civil complaint seeking compensation for the damages suffered by Plaintiffs as the direct and/or proximate result from Defendants' negligent acts and omissions in the treatment of their beloved mother, mother in law and grandmother, Eva Pagán Luna (hereinafter "Doña Eva" or "the Patient"), at the hands of the defendants during her stay at Mennonite General Hospital, Inc. (d/b/a Hospital General Menonita, hereinafter "MGH" or "the Hospital") and its emergency room operated by Emergency Services Group, Inc., which resulted in Ms. Pagán's untimely and unexpected death.

## II. JURISDICTION AND VENUE

2. Federal jurisdiction is proper pursuant to 28 USC § 1332. Specifically, the facts alleged are wholly between citizens of different states. Moreover, Plaintiffs seek monetary compensation for damages which, exclusive of interest and costs, exceed the sum of seventy-five thousand dollars ($75,000.00.) Therefore, Plaintiffs invoke the diversity jurisdiction of this Honorable Court under the provisions of Article III of the Constitution of the United States of America. This Honorable Court has pendent jurisdiction to entertain any other causes of action which may arise under state law.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since the events, acts and/or omissions giving rise to the causes of action stated herein occurred in this District.

## III.  THE PARTIES

4. Plaintiff Eva Alicia Berríos Pagán, in her personal capacity and as a member of the Conjugal Partnership with her husband Justy Román Colón, is of legal age, married and resident the State of Florida, USA. Her physical and postal address is: 55 East 2nd Street, Apartment 16,

Apopka, Florida 32703; her telephone number is (787) 610-6901. Ms. Berríos Pagán was the daughter of Eva Pagán Luna, Deceased.

5. Plaintiff Justy Román Colón, in his personal capacity and as a member of the Conjugal Partnership with his wife Eva Alicia Berríos Pagán, is of legal age, married and resident of the State of Florida, USA. His physical and postal address is: 55 East 2nd Street, Apartment 16, Apopka, Florida 32703; his telephone number is (787) 209-4530. Mr. Román Colón was the son in law of Eva Pagán Luna, Deceased.

6. Plaintiff Yazmín Berríos Fuentes, is of legal age, single and resident of the State of Florida, USA. Her physical and postal address is: 55 East 2nd Street, Apartment 16, Apopka, Florida 32703; her telephone number is (787) 219-2304. Miss Berríos Fuentes was the granddaughter of Eva Pagán Luna, Deceased.

7. Plaintiff Kristian José Castillo Berríos, is of legal age, single and resident of the State of New Jersey, USA. His physical and postal address is: 20 Daymond Street, Trenton, New Jersey, 08611-2822; his telephone number is (609) 826-0217. Mr. Castillo Berríos was the grandson of Eva Pagán Luna, Deceased.

8. Luis Manuel Castillo Berríos was the grandson of Eva Pagán Luna, Deceased. Mr. Castillo Berríos passed away on March 2nd, 2016. The Estate of Luis Manuel Castillo Berríos is solely composed by his mother, Eva Alicia Berríos Pagán. Ms. Berríos Pagán's physical and postal address is: 55 East 2nd Street, Apartment 16, Apopka, Florida 32703; her telephone number is (787) 610-6901.

9. Codefendant Mennonite General Hospital Inc., doing business as Hospital General Menonita, Inc. and/or Sistema de Salud Menonita (hereinafter the "Hospital" or "MGH") is an entity organized pursuant to the laws of the Commonwealth of Puerto Rico, registry number 8394,

with satellite facilities in Aibonito and Barranquitas, among others, and is authorized to do business related to medical services. MGH has judicial standing to sue and be sued. Its postal address is: PO Box 1379, Aibonito, Puerto Rico 00705-1379.

10. Codefendant Dr. René Casas Benabe is, upon information and belief, of legal age, married, doctor in internal medicine and authorized to practice medicine in the Commonwealth of Puerto Rico. His address is: Muñoz Rivera #15, Barranquitas, Puerto Rico 00794; his telephone number is: (787) 857-3215. On the dates relevant to this Complaint, Dr. Casas Benabe was an employee of and/or had privileges to provide patient care at co-defendant MGH and/or Emergency Services' facilities.

11. Jane Doe is the fictional name designated for purposes of this Complaint to Dr. Casas Benabe's wife and who, together with their Conjugal Partnership, are jointly and severally liable to Plaintiffs for the facts and damages alleged herein. The real names of these codefendants will be duly substituted once the information becomes available through the pertinent discovery methods.

12. Codefendant Dr. Rubén Rubero Aponte is, upon information and belief, of legal age, married and a general practice physician authorized to practice medicine in the Commonwealth of Puerto Rico. His address is Carrión Maduro St. #51-C, Coamo, Puerto Rico 00769; his telephone number is (787) 803-0040. On the dates relevant to this Complaint, Dr. Rubero Aponte was an employee of and/or had privileges to provide patient care at co-defendant MGH and/or Emergency Services' facilities.

13. Jane Roe is the fictional name designated for purposes of this Complaint to Dr. Rubero Aponte's wife and who, together with their Conjugal Partnership, are jointly and severally liable to Plaintiffs for the facts and damages alleged herein. The real names of these codefendants

will be duly substituted once the information becomes available through the pertinent discovery methods.

14. Codefendant Dr. Keila S. Resto Torres is, upon information and belief, of legal age, married and a doctor authorized to practice medicine in the Commonwealth of Puerto Rico. Her address is Rd. 108 Km. 4.5, Reparto La Rueda #9, Mayagüez, PR 00680; her telephone number is (939) 639-3565. On the dates relevant to this Complaint, Dr. Resto Torres was an employee of and/or had privileges to provide patient care at co-defendant MGH and/or Emergency Services' facilities.

15. John Doe is the fictional name designated for purposes of this Complaint to Dr. Resto Torres' husband and who, together with their Conjugal Partnership, are jointly and severally liable to Plaintiffs for the facts and damages alleged herein. The real names of these codefendants will be duly substituted once the information becomes available through the pertinent discovery methods.

16. Codefendant Emergency Services Group, Inc. (hereinafter "Emergency Services") is, upon information and belief, a corporation registered in Puerto Rico's State Department with registry number 178019. Its postal address is: PO Box 1883, Cidra, Puerto Rico 00739. Emergency Services has judicial standing to sue and be sued. Emergency Services has a contract with MGH to operate and/or administer its emergency rooms, which includes, but is not limited to, contracting and/or supervising its doctors and/or personnel that work there. Emergency Services is jointly and severally responsible for the negligent acts and/or omissions of its agents, employees, officers and/or shareholders which caused damages to Plaintiffs.

17. Codefendants Professional Partnerships A, B and C is the fictional name given to any and all entities and/or partnerships that may be jointly and severally responsible for the

negligent acts and/or omissions of its agents, employees, officers and/or shareholders which caused damages to Plaintiffs.

18. Codefendants Corporations D, E and F is the fictional name given to any and all entities and/or corporations that may be jointly and severally responsible for the negligent acts and/or omissions of its agents, employees, officers and/or shareholders which caused damages to Plaintiffs.

19. Codefendant Dr. Richard Roe is the fictional name given to any and all individuals who may be jointly and severally responsible for the damages suffered by Plaintiffs.

20. Codefendants Insurance Companies X, Y and Z is the fictional name given to any and all entities and/or corporations that may have issued insurance policies to cover any and all of Defendants' negligent acts and/or omissions and reimburse Plaintiffs for said damages.

## IV.   FACTS COMMON TO ALL CAUSES OF ACTION

21. The emergency rooms located at the Mennonite General Hospital of Barranquitas and Aibonito are satellite facilities of MGH managed and/or administered by Emergency Services. MGH contracted (directly or through Emergency Services) the services of the individual doctors included as codefendants in this Complaint.

22. Codefendant physicians, Dr. Casas Benabe, Dr. Rubero Aponte and Dr. Resto Torres are agents, employees and/or shareholders of MGH and/or Emergency Services, who were/or have granted privileges to care for patients at MGH and/or Emergency Services' facilities, so these respond jointly by the damages caused to the Plaintiffs by said Doctors.

23. The standard of medical care requires from Mennonite General Hospital and/or Emergency Services to conduct a thoughtful, organized and appropriate selection of the doctors hired and granted privileges to care for patients in their facilities. However, the care or lack off by

the codefendant medical doctors within the chain of events in the case was deficient and in direct violation of the best standards of the medicine. Therefore, they are jointly and severally liable to Plaintiffs for the damages caused by their negligence.

24. On March 31, 2012, Doña Eva Pagán Luna (hereinafter "the Patient" and/or "Doña Eva"), a 77-year-old female, went to the emergency room at Mennonite General Hospital in Barranquitas, Puerto Rico, managed and/or administered by Emergency Services, as she was not feeling well and sought medical attention. After being evaluated, Doña Eva was discharged on that same date without being admitted and/or given a proper diagnosis of her condition.

25. The following day, April 1, 2012 at about 3:30 in the afternoon, Doña Eva was taken by her relatives back to the emergency room located at Mennonite Hospital in Barranquitas.

26. The Patient's relatives informed the Hospital's and/or Emergency Services' personnel that Doña Eva had developed general weakness and discomfort.

27. The emergency room's medical chart shows that the patient presented a dangerously diminished blood pressure with documented values of 87 systolic and 50 diastolic.

28. Hospital personnel ordered an electrocardiogram and capillary glucose tests. The Patient was given one (1) liter of normal saline via intravenous and six (6) units of regular insulin.

29. Upon viewing the lab results, Doña Eva was diagnosed with hemodynamic shock, evident by the dangerous elevation of blood glucose, and was immediately transferred to the emergency room located at the Mennonite General Hospital in Aibonito.

30. The Patient was evaluated for the first time at MGH's Aibonito's triage area at 5:49 in the afternoon. However, although Doña Eva's conditioned had worsened, it was not until 10:21pm (almost 5 hours later) that codefendant Dr. Keila S. Resto Torres (hereinafter the "Dra. Resto") first examined her.

7

31. The foregoing shows a poor clinical judgment on the part of the codefendants and lack medical supervision by the Hospital and/or Emergency Services and a clear disregard of the Patient's delicate condition. In addition, upon information and/or reasonable belief, this represents a deviation from the procedures and/or protocols established by the Mennonite Hospital and/or Emergency Services.

32. Upon arrival at the MGH's Aibonito emergency room, the Patient's blood pressure continued to yield dangerously low levels of 96 systolic and 52 diastolic. Capillary glucose was recorded at 401 mg/dl, which is considered a medical emergency for a diabetic patient such as Dona Eva (a fact that was informed to the medical personnel.)

33. At the Aibonito Hospital's emergency room, Doña Eva was categorized as "Class II" and located in the emergency room's observation area.

34. At 9:20pm, Doña Eva's glucose level was recorded in chemical panel at 524 mg/dl which represented a compromising system failure. Further, her blood count revealed an elevated white blood cell count.

35. The nursing staff informed Dr. Resto of Doña Eva's delicate condition, specifically the laboratory results. However, Dr. Resto failed to act in accordance and manner with the adequate medical standards, which would include urgent consults to specialists and/or request to transfer the Patient to the Intensive Care Unit.

36. At 11:00pm, while Doña Eva was still under observation in the emergency room, she manifested periods of disorientation, difficulty breathing, and corporal discomfort. Her relatives pleaded with medical and nursing personnel to help her beloved mother and grandmother but those cries were wasted on deaf ears.

37. Doña Eva was re-evaluated by Dr. Resto Torres at 12 midnight. It was then that Dr. Resto Torres issued an order for low-flow oxygen two (2) liters per minute via nasal cannula. Still, at that time, neither Dr. Resto Torres nor any other physician and/or staff of MGH and/or Emergency Services, ordered or obtained samples of arterial gases from the patient, although this should have been procured given the clinical picture that Doña Eva presented.

38. At 4:30 in the morning of April 2, 2012, a chest X-ray was performed on the Patient. It showed serious cardio-pulmonary problems with acute lung edema.

39. At 5:15 a.m., the nursing staff re-examined Doña Eva's blood glucose. The Patient's vital signs reflected a dangerously accelerated resting heart rate at 128 beats per minute.

40. At 6:03 a.m., upon receiving the laboratory results and having elapsed about seven (7) hours since the initial evaluation, Dr. Resto finally made the decision to consult Doña Eva's case with the medical internist on shift, Dr. René Casas Benabe (hereinafter "Dr. Casas Benabe".)

41. Upon information or belief, the medical and nursing staff shifts at MGH's Aibonito's emergency room rotate at 7:00 a.m. At the time of the shift's rotation, no doctor had ordered the Patient's arterial gas, neither had Dr. Casas Benabe responded to the consult requested by Dr. Resto Torres.

42. At around 7:50 a.m., the emergency room's nursing staff documented that the patient's heart rate was accelerated and irregular and the respirations had increased dangerously in frequency to 30 per minute. Again, no one ordered an arterial gas test, nor was there any change in the administration of oxygen to the Patient.

43. Dr. Rubén Rubero Aponte (hereinafter "Dr. Rubero") ordered and obtained the Patient's first arterial gases on April 2, 2012 at 8:37 a.m. The results showed that Doña Eva was

9

suffering from an accumulation of acid in the blood (metabolic acidosis) and that she was already getting tired of breathing, was retaining CO2 and was at risk of ventilatory failure.

44.     Even when the concentration of oxygen administered to the patient increased, the oxygen in the blood had dangerously decreased to 83mm/Hg. No action was taken in response to these alarming results.

45.     The emergency room medical chart shows that the Hospital and/or Emergency Services' nursing staff documented repeated attempts to contact Dr. Casas Benabe, the internist consulted.

46.     Dr. Casas Benabe evaluated the Patient in response to the consult at 2:25 p.m., even though it had been requested urgently at 6:00 a.m. This lack of medical care and crass negligence contributed to the damages caused to the plaintiffs and to the final and fatal outcome that Doña Eva suffered.

47.     Dr. Casas Benabe evaluated Doña Eva and ordered that she be admitted to the Hospital's intensive care unit.

48.     Even with the medical order issued, Doña Eva remained in the emergency room's observation area.

49.     Dr. Casas Benabe's medical orders consisted of:

   i. Admitting the patient to the intensive care unit with Diagnostics of: stroke (CVA), chronic Renal failure, keto-diabetic acidosis and pulmonary Edema

   ii. Administering oxygen at 100%

   iii. Administering saline solution 0.45 to 100ml per hour.

   iv. Start the Patient in insulin pump, obtain blood and urine cultures, begin empirical treatment and broad-spectrum antibiotics.

10

    v. Perform an electrocardiogram from the heart.

50. The echocardiogram revealed that Doña Eva suffered from heart disease with diastolic failure.

51. The Patient's admission form reflects that neither Dr. Casas Benabe nor any other of the Hospital's and/or Emergency Services' physicians and/or staff ordered new arterial gases, even though they were evidently necessary since 8:37am in order to determine whether to intubate the patient and begin to ventilate mechanically given the critical deterioration of her pulmonary ventilation and oxygenation.

52. The medical chart shows that Dr. Casas Benabe requested a consult with another doctor of last name Laboy. However, the charts that Plaintiffs have in their possession do not state whether Dr. Laboy attended the medical consultation.

53. At 6:35 pm on April 2, 2012, Doña Eva suffered a respiratory arrest, as a result of which a code blue was activated and she was intubated on an emergency basis.

54. At 8:36 pm a sample of arterial gases obtained post-intubation revealed that Doña Eva continued to suffer from an extremely severe metabolic acidosis.

55. The concentration of oxygen in the patient's blood worsened to critical level (10). In response to this picture, Dr. Casas Benabe ordered intravenous infusion of bicarbonate.

56. Past 9:00 p.m., Doña Eva's pulse decreased and she eventually suffered a cardiac arrest which caused the emergency room nursing staff to re-activate the code blue.

57. The Hospital and/or Emergency Services' staff administered cardiopulmonary resuscitation measures, Doña Eva passed away in the emergency room.

58. The foregoing caused surprise and extreme pain to Doña Eva's relatives (some of which are plaintiffs in this action) since, although her health was of care and required medical

attention, at the time she arrived seeking medical assistance Doña Eva was lucid, coherent and alert.

59. The Patient's health status deteriorated as hours passed due to the lack of commitment and care on the defendants' part, including the negligence and omission of the physicians who intervened in her care.

60. It was evident that at the time of her arrival at the Hospital's emergency room, Doña Eva required precise and adequate medical treatment in an urgent manner. However, the Hospital and/or Emergency Services' personnel, including the Codefendant doctors, incurred in a pattern of crass negligence in the care provided to Doña Eva (or lack thereof.)

61. As a matter of fact, the treatment that culminated in Doña Eva's unfortunate demise shows serious and extreme deviations from the good practice of medicine and the processes and/or protocols established by the Hospital and/or Emergency Services. With a high degree of probability, defendants' negligent acts and/or omissions in the inappropriate exercise of their duties contributed to unacceptable and impermissible delays in the evaluation, correct diagnosis and prompt treatment of the Patient.

62. Doña Eva was victim of the defendants' mismanagement of her medical emergency which resulted in her unnecessary, protracted suffering and caused an obvious agonizing state that culminated in the Patient's unfortunate death.

63. Among other things, Dr. Resto Torres did not conduct an adequate initial evaluation or periodically reassessed the patient leaving her laid out on a stretcher without due care, nor did she adequately manage her clinical picture according to the established standards and expected of an emergency room physician in patients with the same clinical picture.

64. Dr. Resto Torres did not offer adequate treatment or medical attention to the evident deterioration of Doña Eva's respiratory system. As a matter of fact, Dr. Resto Torres never assessed arterial gases when it was absolutely required and necessary. This omission triggered Doña Eva to suffer a respiratory arrest.

65. Doña Eva was also the victim of the unacceptable delay in consulting with the Internist doctor on duty. Dr. Resto Torres failed to promptly procure diagnostic procedures and medical treatment required for the Patient while she was under her care.

66. Doña Eva was the victim of the unacceptable delay on the part of Dr. Rubero Aponte in conducting a medical evaluation and making decisions regarding the course of diagnosis and treatment in the face of the evident progressive deterioration of the patient's picture, as documented in the medical record.

67. Doña Eva was subjected to extreme deviations from the expected standards of the best practice of medicine by Dr. Casas Benabe due to, among other things, the unacceptable delay in answering the consult and personally evaluating the patient.

68. In the exercise of the best standard of medical practice, Dr. Resto Torres should have followed up the consultation request she had placed to Dr. Casas Benabe to ensure that her patient was adequately cared for and treated as needed.

69. Dr. Casas Benabe did not demonstrate the competence required for the effective management of the conditions that he himself documented as admission diagnosis.

70. Doña Eva was the victim of Dr. Casas Benabe's omission by not seeking the required consultation with a pulmonologist for handling the mechanical ventilator. Instead, Dr. Casas Benabe abandoned the patient to her fate in the most critical moments on the morning of April 2, 2012, while convalescing.

71. The Hospital and/or Emergency Services' staff's abandonment of the Patient caused her mental suffering and agony, added to a marked deterioration in her cardio-pulmonary and renal systems, which damages became irreversible and resulted in cardiac arrest causing her death.

72. With a high degree of probability, Dr. Casas Benabe could have stabilized the patient and given her the opportunity to survive this health scare. Evidence of this is that Doña Eva showed great cardiopulmonary reserve by tolerating a state of pulmonary edema (water in the lungs) with metabolic acidosis without any adequate support for more than eighteen (18) hours before her unfortunate demise.

73. The medical treatment provided to the patient during her stay in the emergency room at the Hospital was one of obvious apathy and lack of interest in her well-being, dehumanized treatment and neglect by doctors and hospital staff. There was lack of monitoring, negligent and inadequate treatment and lack of analysis and evaluation of her condition, which obstructed and/or eliminated the possibility of stabilization and/or recovery, all causing and/or contributing to her premature and unexpected death.

74. At the time of arrival at the Hospital, Doña Eva's condition was treatable and could have been corrected if she had been provided appropriate early intervention by trained specialists.

75. The direct and immediate cause of the Patient's death was pulmonary edema and metabolic acidosis which went without adequate treatment for over eighteen (18) hours.

76. Patient's unnecessary pain and suffering and her untimely death, as well as her family members' pain and suffering as a result of her untimely passing are a direct result of Defendants' gross negligence which caused delay and a denial of any treatment, which although available, was not provided.

77. Plaintiffs do not have the complete medical and hospitalization records, and therefore, Plaintiffs do not have full knowledge of all the pertinent facts relevant to this medical malpractice action or of all the persons who may actually be liable to them for the damages caused.

78. All Defendants are jointly and severally liable to Plaintiffs under articles 1802 and/or 1803 of the Puerto Rico Civil Code for their tortuous and/or negligent acts and/or omissions, which deviated from the adequate and recognized standards of medical practice, and which directly caused and/or contributed to Doña Eva and her family members' damages, as alleged herein.

## V. FIRST CAUSE OF ACTION - EMOTIONAL PAIN AND MENTAL ANGUISH

79. Plaintiffs reproduce and reaffirm as if alleged herein each and every one of the preceding allegations.

80. As a direct consequence of Defendants gross negligence, Plaintiffs have suffered and will continue to suffer deep and severe mental and emotional anguish, episodes of depression, and loss of enjoyment of life for the loss of their beloved mother and grandmother.

81. Therefore, they each demand a compensation for their respective damages, which are conservatively estimated as follows:

   a. Plaintiffs Eva Alicia Berríos Pagán, Justy Román Colón and their Conjugal Partnership: one million dollars ($1,000,000.00).

   b. Plaintiffs Yasmín Berríos Fuentes, Kristian J. Castillo Berríos and the Estate of Luis Manuel Castillo Berríos: seven hundred fifty thousand dollars ($750,000.00).

## VI. SECOND CAUSE OF ACTION - OBSTINACY AND TEMERITY

82. Plaintiffs reproduce and reaffirm as if alleged herein each and every one of the preceding allegations.

83. Pursuant to Rule 44.1(d) of the Rule of Civil Procedure of the Commonwealth of Puerto Rico, 32 L.P.R.A. Ap. III, R.44, a party adjudged obstinate in the conduct of litigation must pay the prevailing party its reasonable attorney's fees and interest from the date of the filing of the complaint.

84. The defendants have been obstinate and, upon defending against this lawsuit, will continue to incur in obstinacy.

85. As such, Plaintiffs are entitled to reasonable attorney's fees and interest from the date of the filing of the Complaint.

86. Trial by jury is demanded by the Plaintiffs.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs very respectfully request that judgment be entered against the defendants, adjudging them to be jointly and severally liable to the Plaintiffs in an aggregate sum in excess of the total individual amounts stated herein, plus taxable costs, interest from the date of filing of the Complaint, and a reasonable amount in attorney's fees.

**I HEREBY CERTIFY:** that on this same date a true an exact copy of the foregoing document has been filed with the Clerk of the Court using the CM/ECF system.

RESPECTFULLY SUBMITTED.

In Guaynabo, Puerto Rico, this 31st day of December, 2017.

**CARMEN G. TORRECH CABRERO**
PMB 257
Rd. 19 1353
Guaynabo, Puerto Rico 00966
Tel: (787) 241-0081
ctorrech@lopezsolerlaw.com

s/ Carmen G. Torrech Cabrero
**Carmen G. Torrech Cabrero, Esq.**
USDC-PR No. 225013